**STATE of Tennessee**

**v.**

**James David MOATS.**

Supreme Court of Tennessee, at Nashville.

Oct. 5, 2012 Session Heard at Athens.[1]

Filed March 22, 2013.

---

**1.** Oral argument was heard in this case on October 5, 2012, in Athens, McMinn County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Cameron L. Hyder, Assistant Attorney General; Robert Steven Bebb, District Attorney General; and James H. Stutts, Assistant District Attorney General, for the appellant, State of Tennessee.

Matthew C. Rogers (at trial and on appeal), and Randy Rogers (at trial), Athens, Tennessee, for the appellee, James David Moats.

## OPINION

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER and SHARON G. LEE, JJ., joined. CORNELIA A. CLARK and WILLIAM C. KOCH, JR., JJ., filed a dissenting opinion.

While on routine patrol in the early hours of the morning, a police officer observed a pick-up truck parked in a shopping center lot. Because the truck's headlights were turned on, the officer drove into the lot, stopped her patrol car directly behind the truck, and activated her blue lights. Although the officer had seen no indication of criminal activity or distress, she approached the truck, observed a beer can in a cup holder inside, and found the defendant in the driver's seat with the keys in the ignition. When she determined that the defendant had been drinking, he was arrested and later convicted for his fourth offense of driving under the influence. The Court of Criminal Appeals reversed the conviction, holding that the defendant was seized without either probable cause or reasonable suspicion. While we acknowledge that the activation of blue lights will not always qualify as a seizure, the totality of the circumstances in this instance establishes that the officer seized

the defendant absent probable cause or reasonable suspicion and was not otherwise acting in a community caretaking role. The judgment of the Court of Criminal Appeals is affirmed, the conviction is reversed, and the cause dismissed.

## I. Facts and Procedural History

### A. Suppression Hearing

At approximately 2:00 a.m. on Sunday, December 7, 2008, Officer Phyllis Bige of the Etowah Police Department observed an individual, later identified as James David Moats (the "Defendant"), sitting in the driver's seat of a pick-up truck in the parking lot of a BI–LO Grocery. Citizens National Bank, located next door to the grocery, was closed at the time, but a BP gas station across the parking lot was open. "No loitering" signs had been posted at the location, and, previously, a business owner had asked the police to patrol the area more frequently after business hours because of suspected illegal drug activity. As Officer Bige drove by in her patrol car, she noticed that the headlights of the truck were turned on but the engine was not engaged. Officer Bige, who described what she had seen as "out of the ordinary," continued on patrol; however, when she returned to the parking lot some five minutes later and the truck was in the same position, she parked her patrol car behind the truck, activated her blue lights, and called in the license plate number.

As Officer Bige walked toward the truck, she noticed that the window on the driver's side was rolled down. She asked the Defendant "if he was okay," and he replied, "I'm fine." At that point, Officer Bige saw an open beer can in a cup holder on the dash of the truck and keys in the ignition. When she asked why he was parked there, the Defendant replied that he was "just there" and admitted that he had been drinking "a few beers." According-

ing to the officer, the Defendant appeared to be "disoriented, very slow to speak, very sleepy acting," and he was unable to produce either identification or registration for the truck. When Officer Bige's sergeant arrived at the scene, the Defendant struggled to get out of his vehicle and then performed poorly on three field sobriety tests. After being arrested for driving under the influence, the Defendant consented to a test for blood alcohol content, which registered 0.19%.

During cross-examination at the suppression hearing, Officer Bige stated that the Defendant was the only person in the parking lot at the time of his arrest. She conceded that she did not see him drive the truck or otherwise do anything illegal before she approached the vehicle. The officer agreed that the Defendant did not appear to be in need of medical assistance and explained that she stopped to investigate only because it appeared "strange that a car would be ... in a parking lot at almost ... 2 a.m. with the lights on." She acknowledged that when she turned on the blue lights, it was "fair to say that [the Defendant] was not free to leave."

At the conclusion of Officer Bige's testimony, the trial court denied the Defendant's motion to suppress, holding that under these circumstances a police officer, in the role of a community caretaker, is permitted to approach a parked vehicle and to ask for the driver's identification and proof of vehicle registration, and, upon observing possible criminal activity, to detain, further investigate, and ultimately make an arrest.

### B. Trial

Only Officer Bige and the Defendant testified at trial. The officer repeated the testimony that she had provided at the hearing on the motion to suppress. She stated that she observed while her ser-

geant first administered the nystagmus test[2] and then asked the Defendant to do a finger count and recite the alphabet. In her opinion, the Defendant was unable to perform the finger count or to accurately recite the alphabet. As indicated, a blood sample taken from the Defendant established that his blood alcohol content was well over the legal limit.

The Defendant presented a convoluted explanation designed to show that even though he had been drinking excessively, he had not driven his truck to the parking lot. He testified that several hours before his arrest, Bill Hyatt, with whom he had worked years earlier, and a second man, whom he could not identify, stopped by his residence for a visit. He claimed that the unidentified man left after a brief period of time. The Defendant related that he then drove Hyatt to the Log Cabin Bar for drinks and that, later, the unidentified man met them at the bar but did not drink. According to the Defendant, when the three men left the bar, Hyatt drove the pick-up truck, the Defendant rode in the passenger seat, and the unidentified man followed in his separate vehicle. The Defendant stated that when they arrived at the BI–LO parking lot, the other two men left in the unidentified man's vehicle. He explained that he moved into the driver's seat because it was a cold night, cool temperatures exacerbated his pain from a prior back injury, and the truck only had heat on the driver's side. The Defendant contended that when Officer Bige drove by the first time, his truck's engine was running (presumably to heat the interior), but that he had turned the engine off by the time of her return. While asserting that he was not aware of the presence of the beer in his truck, the Defendant admitted that he was intoxicated. He also acknowledged that when questioned at the scene, he did not inform Officer Bige about Hyatt or the unidentified man.

At the conclusion of the proof, the jury found the Defendant guilty of driving under the influence, his fourth offense, and thus a Class E felony. The trial court imposed a Range I sentence of two years.

## C. Appeal

On the appeal as of right, the Court of Criminal Appeals ruled that the Defendant had been seized by Officer Bige at the time the blue lights were activated, reversed the conviction, and dismissed the charge, concluding that at the time of the seizure, the officer lacked a reasonable suspicion based upon specific and articulable facts that the Defendant had either committed a criminal offense or was about to do so. Citing *State v. Williams*, 185 S.W.3d 311 (Tenn.2006), the Court of Criminal Appeals held that these circumstances did not fall within the officer's community caretaking function because " 'the [D]efendant's encounter with the officer was not voluntary, but rather occurred under a show of authority—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave.' " *State v. Moats*, No. E2010–02013–CCA–R3–CD, 2011 WL 5374129, at *4 (Tenn.Crim.App. Nov. 8, 2011) (quoting *Williams*, 185 S.W.3d at 317).

This Court granted the State's application for permission to appeal to consider whether the actions of the arresting officer

---

2. "Nystagmus is an involuntary jerking movement of the eye either as it attempts to focus on a fixed point or as it moves to one side." *State v. Murphy,* 953 S.W.2d 200, 202 (Tenn. 1997). The Horizontal Gaze Nystagmus test is a type of standardized field sobriety test that tracks the movements of the eyes in order to gauge whether a suspect might be driving under the influence. *See id.* at 201–02.

qualified as within her community caretaking role and, therefore, required neither the probable cause necessary to support an arrest nor the level of reasonable suspicion, supported by specific and articulable facts, necessary to support an investigatory stop.

## II. Standard of Review

■■■■ The standard of review applicable to suppression issues is well established. When the trial court makes findings of fact after a suppression hearing, its conclusions are binding upon this Court unless the evidence in the record preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996). As a general rule, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* When the findings of fact are based entirely on evidence that does not involve issues of witness credibility, an appellate court conducts a de novo review. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000). Review of a trial court's application of law to the facts is de novo with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn.1999)).

## III. Analysis

■■■■ Both the federal and state constitutions provide protections from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered by virtue thereof is subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."); Tenn. Const. art. I, § 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures...."). "[T]he most basic constitutional rule ... is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn.1997).[3]

■■■■ These constitutional protections are designed to " 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.' " *State v. Randolph*, 74 S.W.3d 330, 334 (Tenn.2002) (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)); *see also State v. Keith*, 978 S.W.2d 861, 865 (Tenn.1998). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing *Katz*, 389 U.S. at 360, 88 S.Ct. 507); *see also Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *State v. Scarborough*, 201 S.W.3d 607, 616 (Tenn.2006). "While arrests and investigatory stops are seizures implicating consti-

3. Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as consent to search. *See State v. Cox*, 171 S.W.3d 174, 179 (Tenn.2005). As explained below, while the dissent would have us apply the community caretaking doctrine as yet another exception to the warrant requirements of the Fourth Amendment and article I, section 7, we find no basis to further erode the constitutional protections against unreasonable searches and seizures.

tutional protections, consensual encounters are not." *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn.2006). The United States Supreme Court has held that a seizure does not necessarily occur when "a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

 Consistent with these principles, this Court has long recognized three categories of police interactions with private citizens: (1) a full-scale arrest, which requires probable cause, *see Dunaway v. New York*, 442 U.S. 200, 209–10, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *State v. Echols*, 382 S.W.3d 266, 277 (Tenn.2012); (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing, *see Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Williamson*, 368 S.W.3d 468, 474 (Tenn. 2012); and (3) a brief police-citizen encounter, requiring no objective justification, *see United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *State v. Ingram*, 331 S.W.3d 746, 756 (Tenn.2011). *See United States v. Berry*, 670 F.2d 583, 591 (5th Cir.1982) (recognizing a three-tier analysis for warrantless encounters with police); *Nicholson*, 188 S.W.3d at 656; *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn.2000). "Of the three categories, only the first two rise to the level of a 'seizure' for constitutional analysis purposes." *State v. Day*, 263 S.W.3d 891, 901 (Tenn.2008).

## A. Investigatory Stop

 A full-scale arrest supported by probable cause does not, of course, require a warrant. *See State v. Hanning*, 296 S.W.3d 44, 48 (Tenn.2009) (citing *Brown v. Illinois*, 422 U.S. 590, 598, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are "sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense."

*Bridges*, 963 S.W.2d at 491 (second alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see also State v. Richards*, 286 S.W.3d 873, 879 (Tenn.2009). In this instance, the State makes no claim that Officer Bige had probable cause to arrest the Defendant; rather, the State asserts that the circumstances justified an investigatory stop, which does not require a warrant. *See Terry*, 392 U.S. at 20, 27, 88 S.Ct. 1868.

 When an officer has reasonable suspicion, supported by specific and articulable facts, to believe that a criminal offense has been or is about to be committed, a brief investigatory detention is permitted. *Id.* at 21, 88 S.Ct. 1868; *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn.1998). Reasonable suspicion must be supported by more than the officer's "inchoate and unparticularized suspicion or 'hunch,'" *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; however, "'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause ... [and] can arise from information that is less reliable than that required to show probable cause.'" *State v. Pulley*, 863 S.W.2d 29, 32 (Tenn.1993) (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)); *see also Day*, 263 S.W.3d at 903.

 Trial courts must examine the totality of the circumstances when evaluating whether an officer has established the req-

uisite level of suspicion to justify a *Terry* stop. *Binette,* 33 S.W.3d at 218. These circumstances include an officer's observations, information from other law enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, or deductions based upon experience. *State v. Watkins,* 827 S.W.2d 293, 294 (Tenn.1992). When evaluating the reasonableness of the police officer's suspicion, the nature of the crime suspected may be a factor. *See State v. Winn,* 974 S.W.2d 700, 703 (Tenn.Crim.App.1998) ("A frisk has been upheld as reasonable when the suspected crime might typically involve the use of a weapon ... [such that] an officer [may] reasonably infer that a weapon might be in the possession of the suspect.").

Seventeen years ago, our Court of Criminal Appeals, relying on a ruling of the United States Supreme Court, addressed whether a vehicle in a high crime area after midnight served as a basis for an investigatory stop, and concluded that more was required to meet constitutional standards:

> In the instant case, the police officer's sole justification for stopping the appellant was the appellant's presence in a "high crime area" at 2:00 a.m. At least one court has observed that "an area's propensity toward criminal activity is something that an officer may consider. . . . The lateness of the hour is another fact that may raise the level of suspicion." *United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993). However, the same court acknowledged and the Supreme Court has held that an individual's presence in a high crime area, standing alone, is not a basis for concluding that the individual himself is engaged in criminal conduct. *Id.* [; *see also Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ]. We conclude, moreover, that the lateness of

the hour, without more, does not elevate the facts of this case to the level of reasonable suspicion.

*State v. Lawson,* 929 S.W.2d 406, 408 (Tenn.Crim.App.1996).

More recently, our Sixth Circuit Court of Appeals considered similar circumstances and found no basis for an investigatory stop:

> The first two facts—presence in a high-crime location and the lateness of the hour—may not, without more, give rise to reasonable suspicion, but they may be considered in the totality of the circumstances. Nonetheless, these are context-based factors that would have pertained to anyone in the [area] at that time and should not be given undue weight. This caveat is especially appropriate in this case, because *while [the officer] testified that the area was known for drug trafficking specifically, he observed no conduct from [the defendant] consistent with drug activity.*

*United States v. Johnson,* 620 F.3d 685, 692–93 (6th Cir.2010) (first alteration in original) (emphasis added) (citations and internal quotation marks omitted).

Finally, in *United States v. See,* 574 F.3d 309 (6th Cir.2009), the Sixth Circuit Court of Appeals considered facts almost identical to those in the case before us. In *See,* a patrol officer observed three men sitting in a parked car at a public housing complex at 4:30 a.m. *Id.* at 311. The officer parked his police car so as to prevent the driver, See, from driving away. Upon investigation, the officer found a firearm under the driver's seat and made an arrest. *Id.* The district court upheld the investigatory stop and subsequent arrest, observing that the area had a reputation for illegal activities, that the officer had been instructed to give special attention to loiterers, and that See was in a dimly lit area of

the parking lot away from the building at an odd hour of the morning. *Id.* at 312–13.

The conviction was reversed on appeal. The Sixth Circuit first held that when the officer blocked See's vehicle with a marked patrol car, a seizure had taken place because "a reasonable person in See's position would not have felt free to leave." *Id.* at 313; *see also United States v. Foster,* 376 F.3d 577, 584 (6th Cir.2004) ("A consensual encounter can ripen into a seizure if 'in light of all of the circumstances, [ ] a reasonable person [would] have believed that he or she was not free to walk away.'" (quoting *United States v. Grant,* 920 F.2d 376, 382 (6th Cir.1990) (internal quotation marks omitted))). Moreover, the court held that the early hour of the morning, the high crime area, and the request that the officer be on the lookout for loiterers, among the other factors present, did not qualify as reasonable suspicion, explaining that the officer was not responding to a complaint, did not suspect the men of a specific crime, did not observe the men acting suspiciously, and did not cause them to flee upon seeing his police car. *See,* 574 F.3d at 314. In a concurring opinion, a circuit judge explained how what had begun as a consensual encounter transformed into an illegal investigatory stop by virtue of a premature seizure:

> [B]ecause Officer Williams observed the men only for a moment before blocking their exit and had not seen them do anything other than sitting in See's vehicle, I cannot say that there were articulable facts that criminal activity may be afoot, or that the officer had anything more than an ill-defined hunch[ ]. *Officer Williams had every right to investigate further, but he should have simply parked his patrol car alongside See's vehicle to carry out the investigation in a consensual manner.* Instead, he parked his patrol car in such a way so as to block in See's vehicle, thus transforming the encounter into a *Terry* stop.

*Id.* at 315 (Gilman, J., concurring) (second alteration in original) (emphasis added) (citations and internal quotation marks omitted).

 In this case, the Court of Criminal Appeals considered the totality of the circumstances, reviewed Officer Bige's testimony and observations, and concluded that there existed no reasonable suspicion of illegal activity at the time of the stop. While the State argues otherwise, we fully concur that Officer Bige was unable to offer specific and articulable facts sufficient to qualify as reasonable suspicion that the Defendant had committed or was about to commit a criminal offense. She conceded that she did not see the Defendant drive the truck, engage in a drug transaction, or otherwise do anything illegal before activating her blue lights and approaching the truck. The early morning hour and a general request for officers to be on the lookout for suspected illegal drug activity do not, without more, rise to the level of reasonable suspicion. As acknowledged by the Court of Criminal Appeals, an "inchoate and unparticularized suspicion or hunch" does not meet the standard required for an investigatory stop. *Moats,* 2011 WL 5374129, at *4 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

### B. Community Caretaking

 Our primary concern in this instance is whether the actions of Officer Bige qualified as a valid exercise of the community caretaking function, which is defined within the third tier of police-citizen encounters. Unlike full-scale arrests and investigatory detentions, third-tier encounters are consensual and do not require probable cause or reasonable suspicion.

*State v. Hawkins,* 969 S.W.2d 936, 939 (Tenn.Crim.App.1997). These consensual encounters include "community caretaking or public safety functions that involve *no coercion or detention.*" *Id.* (emphasis added). In *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), the United States Supreme Court made its first reference to community caretaking functions, describing the role of the officer in these situations as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."

 Ten years later, the Supreme Court confirmed that some police-citizen encounters were consensual and, in consequence, did not fall within the protections of the Fourth Amendment:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.*

*Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (emphasis added) (citations omitted); *see also United States v. Drayton,* 536 U.S. 194, 201–02, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search ... [,] provided they do not induce cooperation by coercive means.").

 Based in great measure upon these rulings, our courts have consistently recognized that police officers may approach an individual in a public place, whether walking or in a parked car, and ask questions without implicating constitutional protections. *See Daniel,* 12 S.W.3d at 426; *Pulley,* 863 S.W.2d at 30; *State v. Gonzalez,* 52 S.W.3d 90, 95 (Tenn.Crim. App.2000); *State v. Butler,* 795 S.W.2d 680, 685 (Tenn.Crim.App.1990); *see also* 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 433 (4th ed.2004). As the Court of Criminal Appeals observed in *Hawkins,* "[w]ith regard to the community caretaking function, it is now generally held that the police may engage a citizen and ask questions as long as the citizen is willing to carry on the conversation." 969 S.W.2d at 939. In *Hawkins,* the police officer pulled his patrol car behind an awkwardly parked vehicle on a public street and walked toward a person who was standing outside of the vehicle drinking a beer. *Id.* at 937–38. As the officer got closer, he saw in plain view a white powdery substance, a plastic bag, and an open beer can between the legs of the defendant, who was sitting inside the parked vehicle. *Id.* at 938. The defendant admitted that the plastic bag belonged to him, and he was arrested after the officer searched the vehicle and discovered cocaine. *Id.* Upholding the propriety of the arrest, the Court of Criminal Appeals

ruled that the officer was acting within his community caretaking role when he approached the awkwardly parked vehicle. *Id.* at 938–39; *see also Dombrowski,* 413 U.S. at 442, 93 S.Ct. 2523 ("[E]xtensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband.").

While the facts in *Hawkins* are similar to those in the case before us, the opinion in *Hawkins* indicates that although the officer pulled his patrol car behind the awkwardly parked vehicle, he did not activate his blue lights or otherwise exhibit any show of authority. The more difficult question with which we are now faced is whether Officer Bige acted within her role as a community caretaker, like the officer in *Hawkins,* or if she exceeded the scope of the community caretaking function by activating her blue lights under the circumstances.

▮▮▮▮ As stated, the community caretaking function exists within the third tier of consensual police-citizen encounters that do not require probable cause or reasonable suspicion, whereas the requisite level of probable cause or reasonable suspicion must be satisfied when a seizure has taken place. *See, e.g., Randolph,* 74 S.W.3d at 338. The definition of a seizure in this state, as developed by a series of decisions by this Court, varies slightly from the federal definition. In *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the United States Supreme Court determined that a seizure occurs only when an officer uses physical force to detain or when an individual submits to the officer's show of authority. In contrast, this Court has traditionally interpreted article I, section 7 of the Tennessee Constitution as imposing stronger protections than those of the federal constitution, and, therefore, as requiring a departure

from federal precedent when "(1) adopting federal Fourth Amendment standards would require overruling a settled development of state constitutional law; and (2) when linguistic differences justify distinct interpretations of state and federal constitutional provisions." *Randolph,* 74 S.W.3d at 334 (quoting *State v. Vineyard,* 958 S.W.2d 730, 733–34 (Tenn.1997)) (internal quotation marks omitted). Applying the first prong, this Court has explicitly rejected the definition of "seizure" established in *Hodari D.,* opting instead to maintain the definition originally set forth in *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870, that is, "whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he or she was not free to leave.'" *Randolph,* 74 S.W.3d at 336 (quoting *Daniel,* 12 S.W.3d at 425).

▮▮▮▮ Consistent with *Mendenhall* and the constitutional standards developed in our state, this Court has adopted a totality of the circumstances test for determining whether a seizure has occurred. *Daniel,* 12 S.W.3d at 425.

> Some of the factors which are relevant and should be considered by courts when applying this totality of the circumstances test include the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

*Id.* at 425–26. Recognizing that "[t]he test is necessarily imprecise," *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), we further identified several examples of when a po-

lice-citizen encounter has been found to involve a seizure:

> [A]n officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

*Daniel*, 12 S.W.3d at 426 (citing 4 Wayne R. LaFave, Search and Seizure § 9.3(a), at 104 (3d ed.1996 & Supp.1999)).

In the same year this Court decided *Daniel*, the Court of Criminal Appeals, in *Gonzalez*, considered whether a seizure had occurred, thereby implicating constitutional protections, when an officer activated the blue lights on his patrol car after coming upon a stopped vehicle. 52 S.W.3d at 97. The police learned that Gonzalez, who was believed to be a passenger in a blue Ford Taurus, may have been involved in a cocaine transaction. *Id.* at 93. During a routine patrol, an officer observed the Taurus driving in the opposite direction, made a U-turn, and followed the Taurus onto a dead-end street. *Id.* When the Taurus stopped at the end of the street, the driver of the Taurus exited the vehicle and walked toward the officer's patrol car. *Id.* As the driver approached, the officer ordered him back into the Taurus and activated his blue lights. *Id.* The officer then approached the Taurus, smelled marijuana, and found a small amount of cocaine and some drug paraphernalia inside the vehicle. *Id.* He also discovered that Gonzalez was in fact a passenger in the vehicle and that there was a bag of cocaine underneath his seat.

*Id.* The Court of Criminal Appeals held that a seizure had occurred when the officer activated his blue lights and ordered the driver back into his vehicle, indicating "a show of authority such that a reasonable person in the position of either [Gonzalez] or [the driver] would not have felt free to leave." *Id.* at 97.

The court further observed as follows:

> In the context of stopping a moving vehicle, as opposed to a seizure of a parked vehicle, our supreme court has maintained that "[w]hen an officer turns on his blue lights, he or she has clearly initiated a stop." *We see little difference, from the perspective of the occupants in the vehicle, in turning on the blue lights behind a moving vehicle and turning on the blue lights behind a parked vehicle. The lights still convey the message that the occupants are not free to leave.*

*Id.* (emphasis added) (citation omitted). The Court of Criminal Appeals, while holding that Gonzalez had been the subject of a seizure, thereby implicating constitutional protections, specifically addressed the burden placed upon police officers under the same or similar circumstances:

> [W]e are cognizant of the difficult decisions police officers face daily in the exercise of their duties. We realize that when officers desire to question citizens without reasonable suspicion to do so, they may also want to activate their emergency equipment for their own safety so that they will be visible to others.... *Under our decision, police officers who wish to question individuals may be faced with the unsettling choice of whether to activate their emergency equipment for their safety and run the risk of later suppression of any evidence obtained as a result of their questioning or whether to forego questioning the individuals altogether.*

*Such a dilemma does not, however, alter our result.* . . . [T]he test for determining whether a seizure occurs examines the circumstances from the standpoint of the citizen, not the police officer. If a reasonable person would not feel free to leave due to an officer's show of authority, that constitutes a seizure, regardless of why the officer made a show of authority.

*Id.* at 97–98 (emphasis added) (citation omitted).

 Six years after the Court of Criminal Appeals decided *Gonzalez*, this Court addressed "whether [the single act of] activating blue lights constitutes a seizure when a vehicle is already stopped." *Williams,* 185 S.W.3d at 316. Citing *Gonzalez* and considering cases in other states with similar facts but with conflicting results, this Court concluded "that [Williams'] encounter with the officer was not voluntary, but rather occurred under a show of authority—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave." *Id.* at 317. While recognizing that "the officer may have subjectively intended to activate his blue lights solely for his safety and the safety of others on the road," this Court described "the objective belief of a reasonable person in the position of the defendant, not that of the officer," as the litmus test for a seizure. *Id.* at 318.

After confirming the holding in *Gonzalez* that "a police officer initiates a seizure by turning on his blue lights behind a parked vehicle because the lights convey the message that the occupants are not free to leave," *Williams,* 185 S.W.3d at 316 (citing *Gonzalez,* 52 S.W.3d at 97–98), this Court nevertheless made the following observation:

Not all use of the emergency blue lights on a patrol car will constitute a show of authority resulting in the seizure of a person. . . . *[W]hen officers act in their community caretaking function, they may want to activate their emergency equipment for their own safety and the safety of other motorists.*

*Id.* at 318 (emphasis added). Despite these qualifying statements, this Court applied the "litmus test" of "the objective belief of a reasonable person in the position of the defendant, not that of the officer," to find that Williams had been seized by the officer's use of the blue lights. *Id.* Specifically, this Court pointed to the fact that "[t]here was *no evidence of an accident or other peril.* In fact, [Williams'] vehicle was the only vehicle in the area, so *the use of the blue lights was directed solely at [him]." Id.* (emphasis added). Moreover, there was nothing in that case "to indicate that the officer was concerned that [Williams] was in need of assistance." *Id.* In consequence, the Court rejected the possibility that the officer was acting within his community caretaking role. *Id.*

Although this Court acknowledged the community caretaking function, the ruling in *Williams,* especially in light of the language used by the Court of Criminal Appeals in *Gonzalez,* has been largely interpreted to mean that the activation of blue lights constitutes a seizure and, as a practical matter, negates the community caretaking function. *See, e.g., Williamson,* 368 S.W.3d at 476; *Hanning,* 296 S.W.3d at 49; *State v. Ownby,* No. E2011–00543–CCA–R3–CD, 2012 WL 1570987, at *6 (Tenn.Crim.App. May 3, 2012). While today we question our application of the law to the facts in *Williams,* we reaffirm the legal principles stated therein. In consequence, our objective in this instance is to provide some guidance as to when officers may activate their emergency equipment for "their own safety and the safety of other motorists," *Williams,* 185 S.W.3d at

318, without implicating constitutional protections. As indicated, the *Mendenhall* standard, as adopted in *Daniel*, is by definition fact intensive. While the establishment of a bright-line rule may not be possible, the Court of Criminal Appeals has provided examples, in several unreported cases, of when the activation of blue lights has not resulted in a seizure.

In *State v. Jensen*, No. E2002–00712–CCR–R3–CD, 2002 WL 31528549 (Tenn. Crim.App. Nov. 15, 2002), the Court of Criminal Appeals discussed the permissible use of emergency equipment in the exercise of a community caretaking function. An officer and an ambulance driver met at a road intersection and parked their respective vehicles on opposite sides of the road to have a conversation. *Id.* at * 1. The red lights of the ambulance were flashing at the time but the blue lights of the police car were not. *Id.* Jensen drove into the intersection behind the police car and the ambulance, where his car stalled. *Id.* When Jensen could not restart his vehicle, the officer activated his blue lights, stepped out of his patrol car, approached Jensen, and asked if he was having car trouble. *Id.* He answered, "Yeah, I cannot get my vehicle started." *Id.* When the officer smelled alcohol and saw that Jensen's face was flushed, he asked him to step out of the vehicle and subsequently made an arrest. *Id.* While acknowledging that the "activation of blue lights ordinarily triggers a 'stop' or 'seizure,'" the Court of Criminal Appeals observed that "it is not unusual for a police officer to activate

the blue lights on his or her patrol car for safety purposes when on the side of a road or at an accident site." *Id.* at *2.[4]

The Court of Criminal Appeals also approved the use of an officer's blue lights in the exercise of a community caretaking function in *State v. Vandergriff*, No. E2010–02560–CCA–R3–CD, 2012 WL 2445049, at *4 (Tenn.Crim.App. June 28, 2012). At approximately 9:00 p.m., a police officer "was forced to 'slam on his brakes' to avoid hitting [an occupied] truck, which was parked in a 'no pass' zone on [a] two-lane highway." *Id.* at *1. Observing moderate traffic on the highway, the officer activated his blue lights so that other motorists would be aware of the presence of his patrol car and of the truck. *Id.* When the driver stepped out of his truck, without being ordered to do so by the officer, he was unsteady on his feet. *Id.* The officer administered field sobriety tests, and the driver was arrested and later convicted for driving under the influence. *Id.* at *1–2. Although the driver argued that he had been seized without reasonable suspicion, *id.* at *1, the Court of Criminal Appeals distinguished *Williams* and held that the officer had acted within his community caretaking role because

he activated his blue lights to alert other motorists to prevent them for slamming into his vehicle, as he had almost slammed into the defendant's parked truck. *The activation was safety based and done out of concern for the defen-*

---

4. Notably, the Court of Criminal Appeals focused upon the perspective of Jensen, who testified at trial that "he stopped because he thought an accident had occurred, not because he thought [the officer] had indicated he was required to stop." *Id.* at *3. Further, even if a police officer initially activates his or her blue lights within a community caretaking function, there is a point at which the encounter may no longer be consensual, and, there-

fore, becomes a seizure. The court in *Jensen* noted that "the initial contact between [Jensen] and [the officer] did not constitute a seizure, but rather was a consensual encounter"; however, "once [the officer] requested [Jensen] to step out of the vehicle, the consensual encounter was converted into a seizure requiring constitutional protections." *Id.* at *4.

*dant, himself, and other motorists on the roadway.... It was not done as a show of authority directed at the defendant.*

*Id.* at *4 (emphasis added); *see also Dombrowski,* 413 U.S. at 441, 93 S.Ct. 2523 (defining the community caretaking function in the context of "the extensive regulation of motor vehicles and traffic" and "the frequency with which a vehicle can become disabled or involved in an accident on public highways").[5]

■ In this instance, the Court of Criminal Appeals rejected the State's argument that Officer Bige was acting within her community caretaking role because "there was no indication that the [D]efendant needed assistance nor was there any other evidence that she needed to activate the lights for safety reasons." *Moats,* 2011 WL 5374129, at *4. Unlike *Vandergriff,* where the officer nearly slammed into the back of a truck that was stopped in the middle of a highway, Officer Bige, who had been made aware of possible illegal drug activity in the area, parked her patrol car immediately behind the Defendant's truck, which was the only vehicle in the otherwise empty parking lot. There was no objective indication that Officer Bige needed to activate the blue lights to protect either the Defendant or other motorists from possible harm.[6] Finally, without any likelihood of an accident or peril, the activation of Officer Bige's blue lights was directed solely at the Defendant. Because no other cars were in the parking lot and the officer parked directly behind the Defendant, the blue lights could hardly be interpreted as for any purpose other than a notice to the Defendant. Under the totality of these circumstances, a reasonable person would not have felt free to leave. *See Williams,* 185 S.W.3d at 318. In consequence, the use of blue lights qualified as a seizure of the Defendant.

■ Our extensive research suggests that community caretaking can generally be classified into several categories, all of which are separate and distinct from traditional criminal investigation or detection.[7] The primary form of community

5. In *Vandergriff,* the defendant and the officer exited their vehicles simultaneously, so the encounter did not become a seizure until the officer "observed certain behavior by the defendant which led to a reasonable suspicion that he was under the influence." 2012 WL 2445049, at *4. We note that if an officer proceeds to check on a stalled car that is blocking a roadway and appears to need assistance, the community caretaking function ends when the circumstances cease to indicate that the motorist is in need of assistance. *See State v. Anderson,* No. M2006–00138–CCA–R3–CD, 2006 WL 2716873, at *1, *3 (Tenn.Crim.App. Sept. 25, 2006) (reversing conviction based on unreasonable search and seizure because officer activated blue lights after he had already observed defendant's vehicle move into roadway and continue driving properly).

6. As we stated in *Williams,* the "litmus test" for whether the activation of blue lights qualifies as a seizure is "the objective belief of a reasonable person in the position of the defendant, not that of the officer." 185 S.W.3d at 318. The fact that an officer may subjectively intend the use of blue lights as a safety measure is irrelevant.

7. Since the United States Supreme Court decided *Dombrowski,* the community caretaking function has been extended to include "sobriety checkpoints, border searches, drug testing, inventory searches, and searches in public schools." Michael R. Dimino, Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness,* 66 Wash. & Lee L.Rev. 1485, 1490 (2009) [hereinafter Dimino, 66 Wash. & Lee L.Rev.]. The community caretaking role has also been used to justify the "emergency aid doctrine" and the "automobile impoundment/inventory doctrine." Mary Elisabeth Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception,* 26 Am. J.Crim. L. 325, 330 (1999) [hereinafter Naumann, 26 Am. J.Crim. L.]. We

caretaking, which is illustrated by *Hawkins, Jensen,* and *Vandergriff,* is also known as the public safety function and is the type of community caretaking originally identified by the United States Supreme Court. *See* Naumann, 26 Am. J.Crim. L. at 338 (citing *Dombrowski,* 413 U.S. at 441, 93 S.Ct. 2523). In *Dombrowski,* the Court observed that

> [b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident· on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office.

decline to address the myriad circumstances under which the community caretaking function might apply in our state. It is sufficient at this time to conclude that the activation of blue lights on a police vehicle will not always qualify as a seizure, and that the blue lights may be used for community caretaking purposes unrelated to the investigation or detection of criminal activity, when not used as a show of authority directed at a particular person.

8. We are aware that the doctrine of community caretaking, as interpreted and applied in our state—i.e., as a type of third-tier consensual police-citizen encounter—represents a minority rule among other jurisdictions. Indeed, as the dissent points out, the vast majority of courts have applied the community caretaking doctrine as "an exception" to the warrant requirement of the Fourth Amendment to the United States Constitution. *E.g., United States v. Coccia,* 446 F.3d 233, 237–38 (1st Cir.2006); *United States v. Pichany,* 687 F.2d 204, 205 (7th Cir.1982); *People v. Luedemann,* 222 Ill.2d 530, 306 Ill.Dec. 94, 857 N.E.2d 187, 198–99 (2006); *State v. Graham,* 340 Mont. 366, 175 P.3d 885, 890 (2007); *Ullom v. Miller,* 227 W.Va. 1, 705 S.E.2d 111, 120 (2010). As noted in this opinion, however, this Court has for decades interpreted article I, section 7 of the Tennessee Constitution as imposing stronger protections than those of the federal constitution, which, under stare decisis, we are not prepared to dismissively brush aside. Particularly in the area of

413 U.S. at 441, 93 S.Ct. 2523. Like the community caretaking standards that have developed in our state, this type of community caretaking described by the Supreme Court "supports relatively minor or regular interactions with the police: approaching parked cars when the driver appears incapacitated or sick or the car is functioning improperly and approaching pedestrians who appear lost, in danger, or ill." Naumann, 26 Am. J.Crim. L. at 339 (footnote omitted). The core of any community caretaking function is when the police act to protect or assist the public in some manner outside of "the crime-control paradigm." [8] Dimino, 66 Wash. & Lee L.Rev. at 1490.

search and seizure law, we have often rejected the standards adopted by the United States Supreme Court in favor of more protective doctrines, tests, and rules. *See, e.g., State v. Carter,* 16 S.W.3d 762, 768 n.8 (Tenn.2000) (noting that Tennessee has never recognized the "good faith" exception to the exclusionary rule that was adopted by the Supreme Court in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)); *State v. Jacumin,* 778 S.W.2d 430, 435–36 (Tenn. 1989) (refusing to adopt the test for probable cause as established by the Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), because it is "inadequate"); *State v. Lakin,* 588 S.W.2d 544, 549 n.2 (Tenn.1979) ("Where, ... as in the particular phase of search and seizure law under consideration, there has been a settled development of state constitutional law which does not contravene the federal, we are not inclined to overrule earlier decisions unless they are demonstrably erroneous.").

While we recognize the rationale underlying the majority rule, we see no reason to depart from the standards of community caretaking that have developed in our state, particularly because neither party has articulated a persuasive basis for recognizing this as yet another exception to the constitutional protections against unreasonable searches and seizures. *See Lakin,* 588 S.W.2d. at 549 (recognizing that, in the context of the "open fields" doctrine, "[a]lthough the decisions in

## IV. Conclusion

Although the activation of blue lights on a police vehicle ordinarily triggers a stop or seizure, thereby implicating constitutional protections, the totality of the circumstances must be considered to determine whether the police officer was acting within a community caretaking role, which is a concept separate and distinct from the investigation of possible criminal activity. As a general rule, if the activation of blue lights is not used as a show of authority directed at a particular person, the officer is acting within the community caretaking function and need not support his or her actions with reasonable suspicion or probable cause. Because the circumstances here demonstrate that the officer was not acting within a community caretaking role and did not have reasonable suspicion or probable cause to seize the Defendant, the judgment of the Court of Criminal Appeals is affirmed. The conviction is reversed and the cause dismissed. Costs are adjudged against the State.

CORNELIA A. CLARK, J., and WILLIAM C. KOCH, JR., J., dissenting.

We respectfully dissent. We would reverse the judgment of the Court of Criminal Appeals and reinstate the judgment of the trial court, which denied the defendant's motion to suppress because Officer Bige initially "approached [Mr. Moats's] vehicle in her community caretaking function." We are convinced that prior Tennessee decisions have erroneously limited the community caretaking doctrine to consensual police-citizen encounters. We believe the Court should acknowledge this error, overrule the errant precedents, and recognize that the community caretaking doctrine functions as an exception to the Fourth Amendment's warrant and probable cause requirements. We would then conclude that, in this case, the seizure of Mr. Moats was justified under the community caretaking exception. We would not reach the additional question of whether the seizure was supported by reasonable suspicion of criminal activity.

We additionally disagree with the majority's suggestion, in a footnote, that prior Tennessee decisions limiting the community caretaking doctrine to consensual police-citizen encounters derived that rule from article I, section 7 of the Tennessee Constitution. Because the defendant has not argued that Tennessee Constitution article I, section 7 requires such a limitation or grants him greater protection than the Fourth Amendment, we would not address that issue in this appeal.

## I. Analysis

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unrea-

---

this state may be somewhat more restrictive than those in other states or than federal decisions, no compelling reason has been demonstrated in this case for modifying or overruling them"). The Defendant has argued strongly against treating community caretaking as an exception to the warrant requirement, and the State has simply asserted that "the touchstone of this fact-intensive analysis is reasonableness." Unlike the dissent, we decline to adopt an approach to community caretaking that would diminish "the most basic constitutional rule" that war-

rantless searches and seizures are per se unreasonable, simply because it has been adopted by a majority of other courts. In any event, the core basis for applying any form of the community caretaking doctrine requires that the officer's actions be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Dombrowski*, 413 U.S. at 441, 93 S.Ct. 2523. In consequence, even under the test employed by the dissent, Officer Bige's actions would not qualify as community caretaking.

sonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause. . . ." [1] Likewise, article I, section 7 of the Tennessee Constitution ensures that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures," and that "general warrants" lacking particularity and evidentiary support "ought not to be granted." This Court has "long held" that article I, section 7 "is *identical* in intent and purpose to the Fourth Amendment." *State v. Williams*, 185 S.W.3d 311, 315 (Tenn.2006) (emphasis added) (citing *State v. Binette*, 33 S.W.3d 215, 218 (Tenn.2000); *Sneed v. State*, 221 Tenn. 6, 13, 423 S.W.2d 857, 860 (1968)); *see also State v. Donaldson*, 380 S.W.3d 86, 92 (Tenn.2012) ("[I]n the context of traffic stops, the protections afforded by article I, section 7 of the Tennessee Constitution [are] coextensive with the protections afforded by the Fourth Amendment as defined in [*Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ]." (citing *State v. Vineyard*, 958 S.W.2d 730, 734, 736 (Tenn.1997))).

A warrantless search or seizure is presumed unreasonable. *Kentucky v. King*, —— U.S. ——, ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011); *State v. Day*, 263 S.W.3d 891, 901 (Tenn.2008); *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn.2000). This presumption may be overcome, however, if the State demonstrates that the search or seizure was conducted pursuant to one of the exceptions to the warrant requirement. *King*, 131 S.Ct. at 1856 ("[T]he warrant requirement is subject to certain reasonable exceptions."); *Day*, 263 S.W.3d at 901 & n. 9 (enumerating exceptions); *State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn.2006); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn.1997). Of course,

the warrant requirement and other protections afforded by the Fourth Amendment and article I, section 7 are implicated only if a search or seizure occurs, and not every police-citizen interaction results in a search or seizure. *Day*, 263 S.W.3d at 901; *Daniel*, 12 S.W.3d at 424. Tennessee courts have generally recognized three levels of police-citizen interactions: (1) the full-scale arrest, which must be supported by probable cause, (2) the brief investigatory detention, which must be supported by reasonable suspicion of criminal activity, and (3) the brief, consensual police-citizen encounter, which does not amount to a seizure and does not require individualized suspicion or objective justification. *Day*, 263 S.W.3d at 901.

In this appeal, the State concedes that Officer Bige's interaction with Mr. Moats amounted to a warrantless seizure. The State has argued, however, that the seizure of Mr. Moats resulted from the officer's reasonable suspicion of criminal activity and was therefore permissible under *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Alternatively, the State argues that the seizure was justified by the community caretaking doctrine. The majority concludes that the seizure was not supported by reasonable suspicion and is therefore not a valid *Terry* stop. The majority also concludes that the community caretaking doctrine applies only to consensual police-citizen encounters, is not an exception to the warrant requirement, and thus can not justify the warrantless seizure in this case.

We agree with the majority that prior Tennessee decisions have limited the community caretaking doctrine to "third tier" consensual police-citizen encounters. This limitation originated with *State v. Hawkins*, 969 S.W.2d 936, 939 (Tenn.Crim.App.

---

1. The Fourth Amendment applies to the States through the Fourteenth Amendment.

*Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

1997), was adopted by this Court in *Williams,* 185 S.W.3d at 315, and was subsequently repeated as dicta in a footnote in *Day,* 263 S.W.3d at 901 n. 10.

In *Hawkins,* the Court of Criminal Appeals supported its determination that the community caretaking doctrine applies only in the context of "third tier" consensual citizen-police encounters with a citation to *United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982). *Hawkins,* 969 S.W.2d at 939. In Williams, this Court took the same position and cited *Hawkins* and *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), as the supporting authorities. *Williams,* 185 S.W.3d at 315. Finally, *Day* repeated this limitation, citing only *Williams* as support and noting that *Williams* had cited *Hawkins* and *Cady. Day,* 263 S.W.3d at 901 n. 10.

These federal decisions, *Berry* and *Cady,* do not support limiting the community caretaking doctrine to third-tier consensual encounters. *Berry* contains no language supporting such a limitation. In fact, the word "community" does not even appear in *Berry. Cady* actually refutes the idea that the community caretaking doctrine is limited to consensual police-citizen encounters because the Court in *Cady* applied the doctrine to uphold a *warrantless search* in a circumstance far removed from any consensual citizen—police encounter.

The defendant in *Cady* was a Chicago police officer who wrecked his car in Wisconsin. The Wisconsin officers who arrived on the scene believed, erroneously, that Chicago police officers were required to carry their service revolvers at all times. Thus, they searched the defendant, his glove box, and the front-seat area of his automobile. The officers found no revolver. After the vehicle had been towed, a Wisconsin officer searched the vehicle's interior and trunk to avoid "the possibility that a revolver would fall into untrained or perhaps malicious hands." *Cady,* 413 U.S. at 443, 93 S.Ct. 2523. Inside the trunk the officer discovered several bloodstained objects, and this discovery prompted a new investigation that culminated in murder charges against the defendant.

The defendant moved to suppress the evidence discovered during the warrantless search. The United States Supreme Court upheld the search as reasonable under the Fourth Amendment. "Local police officers," the Court said, "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441, 93 S.Ct. 2523. The search was reasonable, and therefore valid, because it was undertaken to protect the safety of the general public. *Cady,* 413 U.S. at 447, 93 S.Ct. 2523. The Court in *Cady* nowhere limited the community caretaking doctrine to consensual police-citizen encounters. On the contrary, the Court applied the exception to uphold a warrantless search of the defendant's vehicle.

Only four states, Illinois, New Mexico, North Dakota, and Tennessee, have ever confined the community caretaking doctrine to consensual police-citizen encounters. *See People v. Luedemann,* 222 Ill.2d 530, 306 Ill.Dec. 94, 857 N.E.2d 187, 197 n. 4 (2006). The supreme courts of two of these states, Illinois and New Mexico, have explicitly abandoned this view and abrogated prior decisions to the contrary. *See Luedemann,* 306 Ill.Dec. 94, 857 N.E.2d at 198–99 ("[T]he 'community caretaking' doctrine is analytically distinct from consensual encounters and is invoked to vali-

date a search or seizure as reasonable under the fourth amendment. It is not relevant to determining whether police conduct amounted to a seizure in the first place."); *State v. Ryon*, 2005–NMSC–005, ¶ 20, 137 N.M. 174, 108 P.3d 1032, 1041 (2005) (acknowledging that "our description of community caretaking encounters was wrong" and cautioning that certain prior decisions should "not be viewed as limiting the community caretaker exception to voluntary or consensual police-citizen encounters").

Although the United States Supreme Court has not addressed the community caretaking doctrine in the thirty years since *Cady,* subsequent federal and state decisions (other than those of Illinois, New Mexico, North Dakota, and Tennessee) consistently describe the doctrine as an exception to the Fourth Amendment's restrictions on warrantless searches and seizures. *See, e.g., Lockhart–Bembery v. Sauro,* 498 F.3d 69, 75 (1st Cir.2007) (observing that the question is not "whether there was a seizure" because, "under the community caretaking doctrine, police action can be constitutional *notwithstanding* the fact that it constitutes a seizure."); *United States v. Coccia,* 446 F.3d 233, 237–38 (1st Cir.2006) ("Generally, a law enforcement officer may only seize property pursuant to a warrant based on probable cause describing the place to be searched and the property to be seized. There are, however, exceptions to this requirement, including the community caretaking exception." (internal footnote and citations omitted)); *Ray v. Township of Warren,* 626 F.3d 170, 174–77 (3rd Cir. 2010) (describing the community caretaking doctrine as an exception to the warrant requirement but refusing to apply it to justify warrantless searches of homes); *United States v. Johnson,* 410 F.3d 137, 144–45 (4th Cir.2005) (applying the "community caretaking exception" to uphold a warrantless search of a vehicle's glove compartment); *United States v. Cervantes,* 703 F.3d 1135, 1140 (9th Cir.2012) (considering "whether the impoundment and subsequent inventory search of Cervantes's vehicle were justified by the community caretaking exception to the Fourth Amendment's warrant requirement"); *United States v. Garner,* 416 F.3d 1208, 1213 (10th Cir.2005) (discussing the community caretaking exception to the warrant requirement); *Williams v. State,* 962 A.2d 210, 216 (Del.2008) (recognizing the " 'community caretaker' or 'public safety' doctrine" as an "exception" to the warrant requirement); *Luedemann,* 857 N.E.2d at 198–99 ("[T]he 'community caretaking' doctrine is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the fourth amendment."); *State v. Crawford,* 659 N.W.2d 537, 543 (Iowa 2003) ("Implicit in any community caretaking case is the fact that there has been a seizure within the meaning of the Fourth Amendment. Otherwise there would be no need to apply a community caretaking exception."); *In Re J.M.E.,* 38 Kan.App.2d 229, 162 P.3d 835, 839 (.2007) (describing the community caretaking doctrine as an "exception" to the Fourth Amendment); *Poe v. Commonwealth,* 169 S.W.3d 54, 56–59 (Ky.Ct.App.2005) (recognizing the community caretaking exception but holding it inapplicable to justify the police action at issue); *Wilson v. State,* 409 Md. 415, 975 A.2d 877, 891 (2009) (recognizing that the community caretaking function as an exception and enunciating a test for its application); *People v. Slaughter,* 489 Mich. 302, 803 N.W.2d 171, 180 (2011) ("We conclude that the community caretaking exception to the warrant requirement applies when a firefighter, responding to an emergency call involving a threat to life or property, reasonably enters a private resi-

dence in order to abate what is reasonably believed to be an imminent threat of fire inside."); *Trejo v. State,* 2008–CT–02133–SCT, 76 So.3d 684, 689, ¶ 14 (Miss.2011) ("We find no reasoned argument in support of a categorical refusal to apply the community caretaking exception to vehicle stops, and we conclude that the community caretaking function in *Cady* may apply in contexts other than inventory searches, as the police provide many functions apart from investigating criminal activity." (internal quotation marks and brackets omitted)); *State v. Graham,* 2007 MT 358, ¶ 25, 340 Mont. 366, 175 P.3d 885, 890 (2007) ("The community caretaker doctrine, like the *Terry* investigative stop, is a recognized exception to the Fourth Amendment's and [the Montana Constitution's] prohibitions against unreasonable searches and seizures."); *State v. Bakewell,* 273 Neb. 372, 730 N.W.2d 335, 338 (2007) ("[W]e hereby adopt the community caretaking exception to the Fourth Amendment."); *State v. Rincon,* 122 Nev. 1170, 147 P.3d 233, 237 (2006) (adopting the community caretaking exception to the Fourth Amendment); *State v. Boutin,* 161 N.H. 139, 13 A.3d 334, 337 (2010) (discussing prior New Hampshire cases applying the community caretaking exception); *State v. Edmonds,* 211 N.J. 117, 47 A.3d 737, 752 (2012) ("The community-caretaking doctrine is an exception to the warrant requirement, not a roving commission to conduct a nonconsensual search of a home in the absence of exigent circumstances."); *Ryon,* 2005–NMSC–005, ¶ 20, 108 P.3d at 1041 (acknowledging that its earlier description of community caretaking as a form of consensual encounter "was wrong" and cautioning that certain prior decisions should "not be viewed as limiting the community caretaker exception to voluntary or consensual police-citizen encounters"); *State v. Dunn,* 2012–Ohio–1008, at ¶ 22, 131 Ohio St.3d 325, 964 N.E.2d 1037, 1042 (2012) ("Thus, we hold that the community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement allows police officers to stop a person to render aid if they reasonably believe that there is an immediate need for their assistance to protect life or prevent serious injury."); *Coffia v. State,* 2008 OK CR 24, ¶¶ 10–13, 191 P.3d 594, 597–98 (2008) (discussing the community caretaking exception to the Fourth Amendment); *State v. Wood,* 149 P.3d 1265, 1267–68 (Or. Ct.App.2006) (describing an Oregon statute as a community caretaking exception to the warrant requirement); *State v. Deneui,* 2009 SD 99, ¶ 33, 775 N.W.2d 221, 235 (2009) ("The community caretaker exception has been recognized only in the context of automobiles by the United States Supreme Court." (citing *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973))); *Wright v. State,* 7 S.W.3d 148, 151–52 (Tex.Crim.App.1999) (describing *Cady* as recognizing "a community caretaking function of law enforcement as a reasonable exception to the Fourth Amendment's warrant requirement" and acknowledging "the existence of the community caretaking function in Texas"); *Provo City v. Warden,* 844 P.2d 360, 363–65 (Utah Ct.App.1992) (upholding a "seizure" as reasonable under the Fourth Amendment based on the community caretaking doctrine); *State v. Ford,* 2010 VT 39, ¶ 11, 188 Vt. 17, 998 A.2d 684, 689 (2010) (recognizing that the "community caretaking exception" is distinct from the emergency aid or emergency assistance exception to the Fourth Amendment warrant requirement); *Knight v. Commonwealth,* 61 Va.App. 297, 734 S.E.2d 716, 720 (2012) ("Searches and seizures conducted without a warrant are presumptively invalid. However, Virginia recognizes a 'community caretaker' exception to the Fourth Amendment warrant requirement." (internal citations omitted)); *State*

*v. Kinzy,* 141 Wash.2d 373, 5 P.3d 668, 676 (2000) ("The community caretaking function exception recognizes that a person may encounter police officers in situations involving not only emergency aid, but also involving a routine check on health and safety."); *Ullom v. Miller,* 227 W.Va. 1, 705 S.E.2d 111, 120 (2010) ("The 'community caretaker' doctrine is a widely recognized exception to the general warrant requirement of the Fourth Amendment of the United States Constitution."); *State v. Kramer,* 2009 WI 14, ¶¶ 16–46, 315 Wis.2d 414, 759 N.W.2d 598, 603–06, 608–12 (2009) (discussing and applying the community caretaking exception).

The weight of these authorities, coupled with *Cady* itself, convinces us that this Court erred in *Williams* by embracing the premise of *Hawkins* that the community caretaking doctrine is limited to consensual police-citizen encounters.[2] We would acknowledge this error, disavow this inaccurate statement of law, and follow the overwhelming majority of other jurisdictions that recognize the community caretaking doctrine as an exception to the Fourth Amendment's warrant and probable cause requirements.

Of course, this Court has the authority to interpret the Tennessee Constitution in a way that provides more protection to Tennessee's citizens than the United States Constitution. *State v. Watkins,* 362 S.W.3d 530, 554–55 (Tenn.2012). Twice before we have exercised this authority and held that article I, section 7 imposes stricter standards than the Fourth Amendment in certain circumstances. *See State v. Jacumin,* 778 S.W.2d 430, 435–36 (Tenn.

1989) (adopting a different standard for evaluating the sufficiency of an affidavit submitted in support of a request for a search warrant); *State v. Lakin,* 588 S.W.2d 544, 549 (Tenn.1979) (acknowledging a more restrictive application of the open fields doctrine under the Tennessee Constitution).

We are puzzled, however, by the majority's suggestion that *Williams* provides another example of this Court interpreting article I, section 7 more strictly than the Fourth Amendment. As we previously noted, *Hawkins* and *Williams* cited only federal authority for the proposition that the community caretaking doctrine is limited to consensual police-citizen encounters. Neither *Hawkins* nor *Williams* explicitly based the limitation on article I, section 7. To the contrary, *Williams* described article I, section 7 as *"identical* in intent and purpose to the Fourth Amendment." Williams, 185 S.W.3d at 315 (emphasis added).[3] *Williams* is also devoid of the sort of analysis we typically apply when we explore whether a provision of the Tennessee Constitution requires an interpretation that diverges from the federal courts' interpretation of a corresponding provision of the United States Constitution. *See, e.g., Watkins,* 362 S.W.3d at 554–56; *Vineyard,* 958 S.W.2d at 733–34. *Williams* nowhere suggests that its holding was based on the Tennessee Constitution or that article I, section 7 should be construed more narrowly than the Fourth Amendment in the context of the community caretaking doctrine.

---

**2.** Justice Clark acknowledges that repeating this inaccurate premise in dicta in *Day* was also error.

**3.** This observation is hardly unique to *Williams. See, e.g., Donaldson,* 380 S.W.3d at 92 ("[I]n the context of traffic stops, the pro-

tections afforded by article I, section 7 of the Tennessee Constitution [are] coextensive with the protections afforded by the Fourth Amendment."); *Binette,* 33 S.W.3d at 218; *Vineyard,* 958 S.W.2d at 733; *Sneed,* 221 Tenn. at 13, 423 S.W.2d at 860.

Furthermore, this appeal presents no opportunity to interpret article I, section 7 differently than the Fourth Amendment with respect to the community caretaking doctrine. The defendant has now had three opportunities to brief the issue. Yet, the defendant has not argued in this Court, or at any other stage of this case, that the Tennessee Constitution affords him greater protection than the Fourth Amendment in this context. Nor has he argued that some aspect of our constitution limits the community caretaking doctrine to consensual police-citizen encounters or precludes recognizing the doctrine as an exception to the warrant requirement.

We would acknowledge that *Hawkins, Williams,* and *Day* erred by limiting *Cady's* community caretaking doctrine to consensual police-citizen encounters. We would disavow that limitation, recognize the community caretaking doctrine as an exception to the Fourth Amendment's warrant and probable cause requirements, and determine whether the exception applies in this case.

As with all Fourth Amendment questions, the touchstone of the analysis is reasonableness. *See Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Reasonableness is judged by an objective standard. *Id.* at 404–05, 126 S.Ct. 1943. Thus, application of the community caretaking exception turns on whether the challenged police action is objectively reasonable considering all of the surrounding circumstances. *See, e.g., Lockhart–Bembery,* 498 F.3d at 75 ("The ultimate inquiry is whether, under the circumstances, the officer acted 'within the realm of reason.' Reasonableness does not depend on any particular factor; the court must take into account the various facts of the case at hand." (internal citations omitted)); *State v. Wixom,* 130

Idaho 752, 947 P.2d 1000, 1002 (1997) ("In analyzing community caretaking function cases, Idaho courts have adopted a totality of the circumstances test. The constitutional standard is whether the intrusive action of the police was reasonable in view of all the surrounding circumstances." (internal citation, quotation marks, and alterations omitted)); *State v. D'Amour,* 150 N.H. 122, 834 A.2d 214, 218 (2003) ("To justify a seizure under the community caretaking exception, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the community caretaking activity." (internal brackets omitted)); *State v. Diloreto,* 180 N.J. 264, 850 A.2d 1226, 1234 (2004) (requiring community caretaking searches to be "objectively reasonable under the totality of the circumstances").

Courts and commentators have developed various analytical tests for determining whether particular police activities fall within the community caretaking exception. However, "[n]o single set of specific requirements for applicability of the community caretaker exception has been adopted by a majority of those states recognizing the exception." *Ullom,* 705 S.E.2d at 122; *see also Deneui,* 2009 SD 99, ¶¶ 36–41, 775 N.W.2d at 237–39 (discussing the various tests); Michael R. Dimino, Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness,* 66 Wash. & Lee L.Rev. 1485, 1498–1512 (2009) (discussing various community caretaking tests); John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions,* 89 J.Crim. L. & Criminology 433, 457–532 (1999) (surveying case law on the community caretaking exception).

We would hold that a warrantless seizure of a parked car is justified under the community caretaking exception if the State establishes that (1) the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed, such as the possibility of a person in need of assistance or the existence of a potential threat to public safety; and (2) the officer's behavior and the scope of the intrusion were reasonably restrained and tailored to the community caretaking need.

The State should not be required to show that the officer was motivated *solely* by community caretaking considerations. The majority suggests that *Cady* imposed this sort of subjective requirement when the Court described community caretaking as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Nowhere does *Cady require* that a community caretaking activity must be "totally divorced" from crime control, especially in a subjective sense. The quotation above simply makes the unremarkable observation that law enforcement officers sometimes do things besides investigate crime. *See Kramer*, 2009 WI 14, ¶ 32, 759 N.W.2d at 608. Even when performing community caretaking functions, peace officers are typically, if not always, attuned to the possibility that they may discover evidence of a crime in any given situation. Such considerations do not defeat Fourth Amendment reasonableness.

The United States Supreme Court has made it clear that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant."

*Brigham City*, 547 U.S. at 404, 126 S.Ct. 1943 (internal citations, quotation marks, and brackets omitted); *cf. Michigan v. Fisher*, 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (per curiam) (noting that the similar "emergency aid" exception to the Fourth Amendment "does not depend on the officers' subjective intent. . . . It requires only 'an objectively reasonable basis for believing'" that immediate aid is needed (quoting *Brigham City*, 547 U.S. at 406, 126 S.Ct. 1943)). In a similar vein, this Court has held that a traffic stop can be justified by probable cause under article I, section 7 "without regard to the subjective motivations of police officers." *Vineyard*, 958 S.W.2d at 736.

Requiring the State to prove that a police action was motivated solely by community caretaking concerns would inappropriately shift the focus to the officer's (irrelevant) subjective motivations. *See Kramer*, 2009 WI 14, ¶ 30, 759 N.W.2d at 608 (concluding that the "totally divorced" language from *Cady* does not mean that if the police officer has any subjective law enforcement concerns, he cannot be engaging in a valid community caretaker function, and requiring only an objectively reasonable basis for the community caretaker function). Thus, the first prong of our proposed test would require the State to show that the officer possessed specific and articulable facts which, viewed objectively and in the totality of the circumstances, reasonably warranted a conclusion that a community caretaking action was needed.

Determining whether police action is objectively reasonable in light of the circumstances requires careful consideration of the facts of each case. Circumstances that should be considered include the nature and level of distress exhibited by the citizen, the location, the time of day, the accessibility and availability of assistance

other than the officer, and the risk of danger if the officer provides no assistance. *See Salinas v. State,* 224 S.W.3d 752, 756 (Tex.App.2007); *State v. Pinkard,* 2010 WI 81, ¶ 42, 327 Wis.2d 346, 785 N.W.2d 592, 605 (2010).

The proof in this record shows that Officer Bige saw a person sitting alone in the driver's seat of a vehicle parked in a deserted commercial parking lot at approximately 2:00 a.m. The vehicle's headlights were on, but the engine was not running. The businesses nearest the vehicle, a bank and a grocery store, were closed, but an adjacent gas station was open. No-loitering signs were posted. Local police had been asked to conduct extra patrols of the parking lot under the suspicion that it was being used for drug transactions.

Officer Bige noticed the vehicle on her initial patrol, circled it, but continued her patrol of the area, and did not immediately approach the vehicle. She returned approximately five minutes later and saw that the vehicle and its occupant were still in the parking lot, with the vehicle's lights still on. Officer Bige parked behind the vehicle but, according to a statement by defense counsel at the suppression hearing, did not block it in. Officer Bige activated her blue lights, called in the license plate number, and approached the vehicle. She said she checked the vehicle because it was "strange that a car would be ... in a parking lot at almost ... 2:00 a.m. with the lights on." As she approached, Officer Bige noticed that the driver's side window was open, and she asked Mr. Moats if he was okay. He responded that he was fine.

The circumstances leading up to this encounter provided specific and articulable facts which, when viewed objectively, would suggest to a reasonable officer that a community caretaking intervention was needed. Under the totality of these circumstances, Officer Bige could have reasonably concluded that the defendant needed assistance due to a vehicle malfunction, a medical emergency, or even that he may have been the victim of a crime.

These facts also demonstrate that Officer Bige's actions were restrained and that the scope of the intrusion was tailored to the community caretaking need. Officer Bige, the only officer on the scene, activated her blue lights, a reasonable precaution given the time of night.[4] She called in the defendant's license plate number, also a reasonable precaution given that officers do not know who is in a car or how that person might react.[5] She approached the driver's side window and posed a single question, inquiring about the defendant's welfare. When Officer Bige saw an open beer can in the cup holder and noticed the defendant's demeanor—"disoriented, very slow to speak, very sleepy acting"—she then had reasonable suspicion of criminal activity and was justified in extending the seizure and administering field sobriety tests. *See People v. McDonough,* 239 Ill.2d 260, 346 Ill.Dec. 496, 940 N.E.2d 1100, 1110 (2010); *Ullom,* 705 S.E.2d at 123–24.

Accordingly, we would hold that the warrantless seizure in this case was justified by the community caretaking exception to the Fourth Amendment's warrant

---

4. *See State v. Walters,* 1997–NMCA–013, ¶ 22, 123 N.M. 88, 934 P.2d 282, 288 (1996) (recognizing that emergency lights convey a signal that an officer approaching a car at night "presents no threat to the occupant of the car").

5. *See People v. Dittmar,* 352 Ill.Dec. 403, 954 N.E.2d 263, 271 (App.Ct.2011) (finding that an officer "informing the dispatcher of the make, model, and license plate number" of a car is "consistent with a public-safety purpose").

and probable cause requirements. No two Fourth Amendment cases are exactly alike. However, our conclusion is consistent with numerous decisions from other jurisdictions that uphold the validity of warrantless seizures—in which officers check on the occupants of parked cars—under the community caretaking exception. *See, e.g., McDonough,* 346 Ill.Dec. 496, 940 N.E.2d at 1109–10 (applying the community caretaking exception when an officer stopped to investigate a stopped car and discovered the occupant drunk); *Dittmar,*954 N.E.2d at 271 (applying the community caretaking exception and rejecting the defendant's argument that the officer should have used amber lights or hazard lights instead of blue lights); *People v. Heap,* No. 2–09–0477, 2011 WL 9686285, at *4 (Ill.App.Ct. May 9, 2011) (unpublished) (applying the caretaking exception and noting that it would have been "irresponsible" for an officer to fail to stop and check on a parked vehicle); *People v. Laake,* 347 Ill.App.3d 1122, 284 Ill.Dec. 203, 809 N.E.2d 769, 772–73 (2004) (applying the caretaking exception when an officer checked a parked car in an isolated area and found the occupant drunk); *City of Mandan v. Gerhardt,* 2010 ND 112, ¶ 12, 783 N.W.2d 818, 822 (2010) (upholding a trial court's finding that "the initial contact with the defendant" was reasonable when the defendant "was in a nearly deserted parking lot at 2 a.m." in January—"it would have been unreasonable for the office[r] not to check and determine if the occupant of the pickup was in need of assistance"); *State v. Rinehart,* 2000 SD 135, ¶ 11, 617 N.W.2d 842, 844 (S.D.2000) (upholding a community caretaking stop of a slow-moving vehicle "to make sure everything was all right"); *Ullom,* 705 S.E.2d at 121–23 (upholding an officer's "safety check" of a parked vehicle that included blocking in the vehicle); *Kramer,* 2009 WI 14, ¶¶ 37–48, 759 N.W.2d at 610–

12 (upholding a community caretaking stop despite the officer's mixed motives in investigating a parked car); *State v. Hammersley,* 2012 WI App 118, ¶ 5, 822 N.W.2d 737 (2012) (unpublished) ("[T]he possibility of assistance being needed, based on unusual vehicle conduct, is what forms the basis of a bona fide community caretaker function."); *State v. Truax,* 2009 WI App 60, ¶¶ 17–21, 318 Wis.2d 113, 767 N.W.2d 369, 375 (2009) (upholding a community caretaking investigation of a parked car and noting that an officer should not delay in checking a car on the side of the road at night in a non-urban area because it could indicate a breakdown or medical emergency); *see also* Mary Elisabeth Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception,* 26 Am. J.Crim. L. 325, 339 n. 71 (1999) (collecting additional cases in which courts have applied the community caretaking exception to an officer's safety check of a parked vehicle); *but see State v. Kurth,* 813 N.W.2d 270, 277–80 (Iowa 2012) (finding the exception inapplicable when the officer blocked in the vehicle of the defendant, whom the officer suspected had just run over a traffic sign); *Hernandez v. State,* 376 S.W.3d 863, 876 (Tex.App.2012) (per curiam) (finding the caretaking exception inapplicable when the officer, investigating a car in a parking lot at 2 a.m., apparently blocked the car in with his cruiser, activated his dashboard camera, shined his spotlight on the driver, and asked, "what are you doing?").

As a practical matter, the limitation adopted in *Williams* may deter Tennessee's police officers from acting as community caretakers—a result that could be detrimental to Tennessee's citizens. As one court has explained, the modern police officer is a "jack-of-all-emergencies" shouldering "multiple responsibilities." *Williams,* 962 A.2d at 216. The Delaware

Supreme Court also observed that police officers are

expected to aid individuals who are in danger of physical harm, assist those who cannot care for themselves, and provide other services on an emergency basis. To require reasonable suspicion of criminal activity before police can investigate and render assistance in these situations would severely hamstring their ability to protect and serve the public.

*Williams,* 962 A.2d at 217 (internal footnote and quotation marks omitted).

Indeed, as many courts have recognized, the public has a strong interest in encouraging the police to act as community caretakers. *See, e.g., Kramer,* 2009 WI 14, ¶ 42, 759 N.W.2d at 611 ("[T]he public has a substantial interest in police offering assistance to motorists who may need assistance, especially after dark and in areas . . . where assistance may not be near at hand."). Courts have even described community caretaking as a duty. *See, e.g., McDonough,* 940 N.E.2d at 1109–10 ("[Because t]he public has a substantial interest in ensuring that police offer assistance to motorists who may be stranded. . . . a law enforcement officer has the right to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles."); *State v. Goebel,* 103 Wis.2d 203, 307 N.W.2d 915, 917 (1981) ("[Community caretaking contacts] are not only authorized, but constitute an important duty of law enforcement officers.").

There is nothing unreasonable about an exception to the warrant requirement that allows peace officers to perform their "right" and "duty" to act as community caretakers. "It must always be remembered that what the Constitution forbids is not all searches and seizures, but [only]

unreasonable searches and seizures." *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Because searches or seizures premised on legitimate caretaking concerns are not unreasonable, validating them does not erode any of the constitutional protections or diminish any of the constitutional rights we all hold so dear.

For these reasons, we respectfully dissent. Instead, we would reverse the judgment of the Court of Criminal Appeals and reinstate the trial court's judgment denying the motion to suppress because Officer Bige approached Mr. Moats's "vehicle in her community caretaking function." Because the seizure was justified by the community caretaking exception, we would decline to address the State's alternative argument that the seizure was based on reasonable suspicion of criminal activity.